UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ITYX SOLUTIONS, AG,                    *
                                       *
            Plaintiff,                 *
                                       *
      v.                               *
                                       *
KODAK ALARIS INC.,                     *
                                       *
            Defendant; Counterclaim    *
            Plaintiff,                 *        Civil Action No. 16-cv-10250-ADB
                                       *
      v.                               *
                                       *
ITYX SOLUTIONS AG; ITYX                *
SYSTEMWICKLUNG OHG; ITYX               *
TECHNOLOGY GMBH; SÜLEYMAN              *
ARAYAN; and HEIKO GROFTSCHIK,          *
                                       *
            Counterclaim Defendants.   *

**<u>MEMORANDUM AND ORDER</u>**

BURROUGHS, D.J.

Plaintiff ITyX Solutions AG ("ITyX AG") and Defendant Kodak Alaris, Inc. ("Kodak")

engaged in a strategic partnership to develop and market "intelligent document recognition"

software products. After the relationship soured and a commercial dispute arose between them,

ITyX AG filed this lawsuit against Kodak for breach of contract, declaratory judgment, and

injunctive relief. [ECF No. 1] ("Complaint"). Kodak in turn brought counterclaims for breach of

contract, breach (and aiding and abetting the breach) of a fiduciary duty, tortious interference

with contractual and business relations, and declaratory judgment against ITyX AG as well as

the related parties ITyX Systemwicklung OHG ("ITyX OHG"), ITyX Technology GMBH

("ITyX Technology"), ITyX AG's CEO Süleyman Arayan, and ITyX AG's co-founder Heiko

Groftschik (the "Counterclaim Defendants, and collectively with ITyX AG, the "ITyX Parties").

[ECF No. 122] ("Counterclaims").

Currently pending before the Court are (1) ITyX Technology's motion for judgment on the pleadings [ECF No. 158]; (2) ITyX AG's motion for partial summary judgment [ECF No. 182]; (3) Counterclaim Defendants' motion for summary judgment [ECF No. 185]; and (4) Kodak's motion for summary judgment [ECF No. 187]. A hearing on the pending motions was held on May 20, 2018. [ECF No. 236]. For the following reasons, the motion for judgment on the pleadings is <u>DENIED</u>; ITyX AG's motion for partial summary judgment is <u>DENIED</u>; Counterclaim Defendants' motion for summary judgment is <u>DENIED</u>; and Kodak's motion for summary judgment is <u>GRANTED</u> in part <u>DENIED</u> in part.

## I.    BACKGROUND

Except as otherwise noted, the following undisputed facts are taken from the ITyX Parties' Joint Statement of Material Facts Not in Dispute [ECF No. 184] ("ITyX Facts"), and the Statement of Undisputed Material Facts in support of Kodak's motion [ECF No. 189] ("Kodak Facts").

### A.    Intelligent Document Recognition

ITyX AG is a German software company that created an intelligent document recognition ("IDR") software suite. ITyX Facts ¶¶ 1−3. IDR software products interpret documents, extract text-based content from them, and organize that content for the user. <u>Id.</u> ¶ 2. Text-based content exists in either a structured or unstructured form. Kodak Facts ¶¶ 1−2. Unstructured content is not strictly ordered or oriented, such as with e-mails, text messages, and social media. <u>Id.</u> ¶ 2. Structured content always appears in the same place, as in forms and invoices. <u>Id.</u> Before the IDR process begins, information in a document must be "captured" so that it can be accessed and

integrated into a user's information systems. Id. ¶ 3. This "capture" phase involves scanning a document and saving it as a digital image, and may also involve processes like optical character recognition. Id. IDR generally refers to the post-capture steps of automatic classification, extraction, and validation of the text-based content. Id. ITyX AG's software suite uses an ITyX AG-created platform to carry out these IDR processes. ITyX Facts ¶ 3.

## B. Master Agreement

In 2011, ITyX AG and Eastman Kodak Company ("EKC") began discussing a potential business relationship and, on January 18, 2012, entered into a contract titled the "Master Agreement" [ECF No. 190-3]. ITyX Facts ¶¶ 4−5. The day after executing the Master Agreement, EKC filed for bankruptcy. Id. ¶ 6. One and a half years later, in September 2013, Kodak stepped into the shoes of EKC as the counterparty to the Master Agreement.[1] Id. ¶¶ 6−7.

The Preamble to the Master Agreement recites that the parties intend to enter into a "strategic partnership" in the IDR market and describes an arrangement whereby ITyX AG will license certain software to Kodak, and Kodak will integrate that software into a Kodak-branded product. Master Agreement at 5; ITyX Facts ¶ 5. Because IDR was a new market for Kodak, the parties anticipated that it would take about three years for Kodak to build a successful business. Master Agreement at 5. During that time Kodak was to invest in a team to deliver and market the product under the Kodak brand, but with ITyX AG providing the product itself and "significant technical assistance and market knowledge to enable the Kodak team to achieve success." Id.

The Master Agreement refers to the Kodak-branded product, which was eventually marketed under the name "Info Insight," as the "Kodak Product" or the "Kodak IDR Product." Master Agreement at 6; ITyX Facts ¶¶ 12−13. The Kodak Product, which incorporates

---

[1] Because Kodak assumed the rights and obligations of EKC under the Master Agreement, the Court will refer to EKC as Kodak when describing the terms of the Master Agreement.

proprietary methods and algorithms for IDR classification and extraction, is best applied to documents with unstructured text-based content, whereas traditional methods of IDR classification and extraction are best suited for structured content. Kodak Facts ¶¶ 4−7. Section 1.2 of the Master Agreement more specifically defines the "Kodak Product" as:

> the product, product family, and components of products, more particularly described as the Kodak IDR Product, that Kodak intends to distribute to [end users] and will include or incorporate the Licensed Software but only as described in Appendix A Exhibit 1 . . . (but not any Licensed Software described in [Appendix A Exhibit 2]) supplied by [ITyX AG] and as developed pursuant to this Agreement.

Master Agreement at 6. The technical and functional features of the "Licensed Software" are described in more detail in Appendix A to the Master Agreement. Id. at 5, 6, 40.

The Master Agreement, which is governed by New York substantive law, has an initial term of five years commencing on January 18, 2012 and "automatically renew[s] on its anniversary date for successive two-year periods . . . thereafter unless otherwise terminated as provided [in the Master Agreement]." Id. at 7. Either party may terminate the Master Agreement for cause "after a material breach by the other Party" and by giving written notice to the defaulting Party, "specifying the default in reasonable detail," unless "the defaulting Party cures the default within 30 days after receipt of the [default notice] or, if such default cannot be cured within such time, the defaulting Party does not promptly start diligently and continuously in good faith to cure the default." Id. at 9. Other provisions of the Master Agreement will be discussed herein as necessary.

### C. Investment Framework Agreement

In June 2014, Kodak's parent company, Kodak Alaris Holdings ("KAH") entered into an Investment Framework Agreement [ECF No. 190-29] ("IFA") with ITyX OHG, ITyX Technology, and Mr. Arayan, the ITyX AG CEO, to acquire 25.1% of ITyX Technology. ITyX Facts ¶ 28. In accordance with the IFA, ITyX Technology was to acquire ITyX AG and another

affiliated company. Id. ¶ 29. In exchange, KAH would invest €12.6 million directly with ITyX Technology over the course of 16 months as follows: KAH would pay €4 million on April 1, 2015 and €4 million on October 1, 2015, as well as €50,000 each month for the twelve months following the execution of the IFA. Id. ¶ 30. If KAH defaulted on its payment obligations under the IFA for more than 30 days, ITyX OHG and ITyX Technology could exercise a "call option" and purchase all of KAH's shares of ITyX Technology in exchange for waiving all of KAH's outstanding obligations under the IFA for an additional €1. Id. ¶ 31.

### D. Default Under the IFA and Exercise of the Call Option

In June 2015, by which time the relationship between Kodak and ITyX AG was already deteriorating, KAH failed to timely make one of the monthly payments required under the IFA. Id. ¶¶ 42−43. On November 23 or 24, 2015, ITyX OHG gave written notice to KAH that it was exercising the call option due to the missed monthly payment, and KAH's rejection of ITyX Technology's request for an investment of an additional €2 million into ITyX Technology.[2] Id. ¶ 44; [ECF No. 209-45] ("Exercise Notice"). Kodak asserts that soon after KAH learned of the inadvertently missed payment, it paid the missing amount to ITyX OHG but that ITyX OHG declined to withdraw the Exercise Notice. [ECF Nos. 212 at 7−8]; [ECF No. 213 at ¶ 48].

On December 18, 2015, KAH sent a letter to ITyX OHG and ITyX Technology, which (1) stated that KAH did not need to comply with the call option, (2) terminated the IFA for

_____

[2] Section 4.2 of the IFA states that "[i]n support of acquisitions or similar strategic investments, [KAH] undertakes to invest in [ITyX Technology] up to an additional [€2 million] during the 2015 calendar year or later, within a period of 90 days upon request by [ITyX Technology]." IFA at 13. According to the Complaint, on May 28, 2015, ITyX Technology requested a €2 million investment that KAH never completed. Compl. ¶¶ 85−87. Kodak alleges in its Counterclaims that the parties engaged in discussions regarding an investment but because no viable transaction emerged, there was no "strategic investment" requiring KAH to comply with Section 4.2. Counterclaims ¶¶ 66−67.

cause, and (3) noticed KAH's withdrawal as a shareholder of ITyX Technology. ITyX Facts at 45; [ECF No. 209-44] ("December 18 KAH Notice"). KAH asserted that by sending the Exercise Notice, ITyX OHG "ha[d] severely and intentionally violated its fiduciary duties owed to [KAH] under the [IFA] and as a co-shareholder of [ITyX Technology];" that the call option, which triggered the purchase of KAH's shares of ITyX Technology worth at least €12.6 million for just €1, was immoral and void; and that the Exercise Notice had permanently destroyed the relationship of trust between the parties. December 18 KAH Notice at 3–4.

On that same day, December 18, 2015, Kodak notified ITyX AG by letter that the exercise of the call option "also constitute[d] a material breach" of the Master Agreement and related follow-on agreements, which could not be cured and thereby voided the contracts. [ECF No. 81-20] ("December 18 Kodak Notice"); ITyX Facts ¶ 46. The letter also conveyed that even if there was no breach of the Master Agreement, Kodak was exiting the IDR business as provided for in the exceptions to Kodak's exclusivity obligations under the Master Agreement. ITyX Facts ¶ 47.

## II.    PROCEDURAL HISTORY

ITyX AG filed this lawsuit on February 15, 2016. [ECF No. 1] ("Complaint"). Count I seeks a declaratory judgment that Kodak's purported termination of the Master Agreement was not effective, and that the Master Agreement is still binding on the parties. Compl. ¶¶ 117–18. Count II requests injunctive relief in the form of an order enjoining Kodak from developing or marketing products that compete with the Kodak Product. Id. ¶ 127. Counts III and IV seek damages for Kodak's allegedly improper termination of the Master Agreement and the related follow-on agreements. Id. ¶¶ 129–47.

Shortly after filing the Complaint, ITyX AG moved for a preliminary injunction to enjoin Kodak from engaging in the IDR business and from marketing and selling (1) "Capture Pro" software (which contains IDR functionality, but pre-dated the Master Agreement), (2) a second-generation version of Capture Pro, "Capture 2.0," and (3) large document scanners equipped with IDR software named "Synergetics." [ECF No. 23]. The Court allowed ITyX AG to engage in some expedited discovery in connection with the motion for a preliminary injunction [ECF No. 34], but ultimately denied the motion, because ITyX AG failed to show any imminent risk of irreparable harm from the alleged competition with Capture Pro, Capture 2.0, or Synergetics. [ECF No. 100].

Sometime in March 2016, ITyX OHG filed a lawsuit in the District Court of Frankfurt am Main, Germany related to its exercise of the call option. [ECF No. 78 at 6]. On April 6, 2016, KAH filed its own lawsuit in the District Court of Frankfurt am Main, Germany naming ITyX OHG, ITyX Technology, and Mr. Arayan as defendants and alleging (1) that the call option was null and void under German law, and (2) that the defendants breached their fiduciary duties to KAH by sending the Exercise Notice. Id.

On April 15, 2016, Kodak filed a motion to dismiss the Complaint or to stay this action pending the resolution of the two related lawsuits filed in Germany. [ECF No. 38]. This Court denied the motion to dismiss or stay the action, because it was "not prepared to find that the parties and/or contractual relationships at issue [were] sufficiently aligned," or that the legal issues in the cases in Germany were similar enough to the issues in this case, to warrant a stay. [ECF No. 78 at 9].

On March 20, 2018, the District Court of Frankfurt am Main issued a written decision on KAH's lawsuit. [ECF No. 223-1]. According to the Counterclaim Defendants' representations

and a certified English translation of the decision, KAH's claims that ITyX OHG breached its fiduciary duty by sending the Exercise Notice were dismissed. [ECF Nos. 220, 222, 222-1, 223, 223-1]. Because the German court's decision is apparently on appeal, the Court will not treat the German court's decision as final at this time.

## III.     LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. An issue is considered "genuine" when "the evidence of record permits a rational factfinder to resolve it in favor of either party." Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 4–5 (1st Cir. 2010) (citing Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)). A fact is considered "material" when "its existence or nonexistence has the potential to change the outcome of the suit." Id. at 5 (citing Martínez v. Colón, 54 F.3d 980, 984 (1st Cir. 1995).

"To succeed in showing that there is no genuine dispute of material fact, the moving party must direct [the Court] to specific evidence in the record that would be admissible at trial." Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir. 2015). "That is, it must 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" Id. at 4–5 (citing Carmona v. Toledo, 215 F.3d 124, 135 (1st Cir. 2000)). Once the moving party has laid out its basis for summary judgment, the burden shifts to the party opposing summary judgment to demonstrate, "with respect to each issue on which she would bear the burden of proof at trial, . . . that a trier of fact could reasonably resolve that issue in her favor." Borges, 605 F.3d at 5.

On a motion for summary judgment, the Court reviews "the entire record in the light most hospitable to the party opposing summary judgment." Podiatrist Ass'n, Inc. v. La Cruz Azul De P.R., Inc., 332 F.3d 6, 13 (1st Cir. 2003). Where inferences are to be drawn from the stated facts, those inferences "must be viewed in the light most favorable to the party opposing the motion." Oleskey ex rel. Boumediene v. U.S. Dep't of Def., 658 F. Supp. 2d 288, 294 (D. Mass. 2009) (citing Founding Church of Scientology of Wash., D.C., Inc. v. Nat'l Sec. Agency, 610 F.2d 824, 836 (D.C. Cir. 1979)). The Court, however, "safely may ignore conclusory allegations, improbable inferences, and unsupported speculation." Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) (internal quotation and citation omitted).

When a court faces cross motions for summary judgment, it applies the above analysis, unaltered, "to each motion in turn." Wilkinson v. Chao, 292 F. Supp. 2d 288, 291 (D.N.H. 2003) (citing Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996)); see also Cochran, 328 F.3d at 6 ("This framework is not altered by the presence of cross-motions for summary judgment.").

## IV.    KODAK'S SUMMARY JUDGMENT MOTION

Kodak moves for summary judgment on all of the claims asserted in the Complaint for lack of standing. Alternatively, Kodak requests partial summary judgment on a number of issues as addressed below.

### A.    Standing

Kodak asserts for the first time in this litigation that the Complaint should be dismissed in its entirety for lack of standing. In Section 9.3 of the Master Agreement, titled "Warranty of Title," ITyX AG represents that "it is the copyright owner of the Licensed Software or has and shall retain the authority to enter into and perform this Agreement and to grant licenses . . . to

Kodak to the Licensed Software in conformance with the terms of this Agreement." Master Agreement at 25. There appears to be a factual dispute as to whether ITyX Technology or non-party ITyX Gesellschaft für Systemtwicklung und Beratung mbH ("ITyX Gesellschaft") actually owns the intellectual property rights to the relevant software. Compare [ECF No. 188 at 14] (Kodak describing evidence that ITyX Technology is the holder of the pertinent IP rights) with [ECF No. 235 at 3] (ITyX AG asserting that, based on certain contracts, ITyX Gesellschaft is the owner of the software). Kodak argues that ITyX AG has provided no evidence that it was authorized to license the rights to the Licensed Software when entering the Master Agreement. ITyX AG responds that this newly raised "standing" argument is untimely and should be deemed waived. Moreover, even if the Court considers the argument, ITyX AG contends that it was authorized to grant licenses to the relevant software pursuant to agreements entered into between and among various ITyX-affiliated parties in 2005, 2007, and 2009 [ECF No. 204 at 6], or pursuant to the consent of the owner of the software. [ECF No. 235 at 4−6].

Kodak dodges ITyX AG's timeliness argument by asserting that a challenge to standing cannot be waived. Kodak, however, fails to show that its argument actually sounds in Article III of the Constitution, as opposed to a contract-based affirmative defense or counterclaim based on the purported breach of a condition precedent to performance under the Master Agreement, which can be waived. Kodak has not cited a single case or other authority in support of framing the alleged breach of Section 9.3 as a constitutional standing issue.[3] Even assuming that Kodak's

---

[3] Although the ITyX Parties made a passing reference to this point during the summary judgment hearing, their briefing does not dispute that Kodak's argument arises out of Article III, nor have the ITyX Parties provided any authority for treating Kodak's argument as a waivable affirmative defense. Because Kodak represents that it did not discover this issue until conducting depositions, and both sides have now had an ample opportunity to brief and submit evidence in support of their respective positions, including ITyX AG's submission of documents not previously produced, the argument is not waived.

argument raises a threshold jurisdictional question, there is a disputed issue of material fact as to whether—either through the 2005, 2007, and 2009 agreements [ECF Nos. 221-3, 221-4, 221-5, 221-6, 221-7] or the owner's consent [ECF No. 235]—ITyX AG had the authority to license the relevant software at the time the Master Agreement was executed. Accordingly, summary judgment based on a lack of standing is denied.

**B.      Kodak's Exclusivity Obligations and Exceptions**

Kodak first asks the Court to adopt its interpretation of the exclusivity provisions of the Master Agreement and then moves for partial summary judgment on Count II of the Complaint to the extent that ITyX AG fails to show that Kodak's alleged sale and marketing of Capture Pro, Capture 2.0, or Synergetics violated its exclusivity obligations.

1.      <u>Interpretation of Exclusivity Provisions</u>

Under Section 3.1 of the Master Agreement, Kodak agreed to "solely distribute the Kodak Product" and to "not develop a product functionally equivalent to the Kodak Product" while the Master Agreement is in effect. Master Agreement at 7. In exchange for Kodak's exclusivity commitment, ITyX AG agreed to not provide certain software to any person or entity which directly competes with Kodak. <u>Id.</u> at 8. The Master Agreement also contains exceptions to Kodak's exclusivity obligations. <u>Id.</u> In relevant part, under Section 3.2(iii), titled "Exiting the IDR Business," Kodak may in its sole good faith business judgment decide to abandon the "IDR business represented by the Kodak Product." If this exit provision is triggered, for a period of two years after leaving the IDR business, Kodak will not sell a "new Kodak-IDR product" that is not supplied by ITyX AG. <u>Id.</u> at 8. "IDR business represented by the Kodak Product" and "new Kodak-IDR product" are not defined terms.[4]

---

[4] Kodak also moved for summary judgment to declare that the invocation of Section 3.2(iii) supplants the exclusivity provision. ITyX AG does not oppose Kodak's interpretation, which is

Kodak argues that upon exiting the "IDR business represented by the Kodak Product," (1) the prohibition on the sale of a "new Kodak-IDR product" only precludes Kodak from selling a product that has identical features as the Kodak Product, and (2) the meaning of "the IDR business represented by the Kodak Product" does not encompass the entirety of the IDR market but only the more limited, high-end niche submarket related to the classification and extraction of unstructured data. In sum, Kodak asks the Court to hold that the Exiting the IDR Business exception "only bans [Kodak] from selling a product that directly competes with the Kodak IDR Product, i.e., the products that share the same functions and capabilities so that one would replace the other." [ECF No. 188 at 21].

ITyX AG responds that because "new Kodak-IDR product" is a unique term compared to "Kodak Product" (or "Kodak IDR Product"), the scope of the exit provision's sale prohibition is broader than the sale of the Kodak Product's equivalent. According to ITyX AG, "new Kodak-IDR product" means a Kodak product "that engages in [IDR]" and is not confined to the specialized, high-end niche submarket described by Kodak. [ECF No. 204 at 14–15].

Here, the term "new Kodak-IDR product" is similar to "Kodak IDR Product" or "Kodak Product" but nonetheless they are distinct terms and therefore need not embody the exact same product specifications. Kodak's view that a "new Kodak-IDR product" must be a replacement for the Kodak Product is overly narrow. Although the Court used "replacement" as a means of comparing products at the preliminary injunction stage, that standard need not govern here where the issue is the interpretation of the contract, which the Court expressly deferred at the preliminary injunction stage. See [ECF No. 100 at 13] (likelihood of success on merits "is bound

---

reasonable given that the "Exiting the IDR Business" provision is described in the Master Agreement as an "exception" to the exclusivity obligations. Summary judgment is therefore granted on this undisputed issue.

up with knotty questions of contract interpretation, which the Court sees no need to unravel at this point in the proceedings.").

That being said, ITyX AG's claim that "new Kodak-IDR product" encompasses any type of IDR product is overbroad. The "Exiting the IDR Business" exception is clear that the abandonment of the IDR business "represented by the Kodak Product" triggers the restriction on the sale of a "new Kodak-IDR product." Here, where the purpose of the exception is plainly to protect the Kodak Product from competition where the exclusivity provision is no longer in effect, interpreting "new Kodak-IDR product" as encompassing any product in the IDR business, as ITyX AG suggests, would render the language "represented by the Kodak Product" superfluous.

Accordingly, although the Court will defer a final interpretation of the exclusivity obligations and exceptions, the Court at this stage finds "new Kodak-IDR product" to mean an IDR product that has substantially similar functions and capabilities as the Kodak Product such that the new Kodak-IDR product and the Kodak Product directly compete with one another. Likewise, the Court preliminarily defines "IDR business represented by the Kodak Product" as encompassing that portion of the IDR business that relies on the functionality of the Kodak Product and where a "new Kodak-IDR product" would directly compete with the Kodak Product, even if not capable of entirely replacing it.

2.  Capture Pro, Capture 2.0, and Synergetics

Kodak next claims that there is no issue of material fact as to whether Kodak has violated its exclusivity obligations through the marketing or sale of Capture Pro, Capture 2.0, or Synergetics. ITyX AG concedes that Capture Pro and Capture 2.0 do not compete with the Kodak Product. [ECF No. 204 at 8]. The parties also do not dispute that even if partial summary

judgment is granted, Count II of the Complaint shall proceed to trial on Kodak's sale and marketing of its current IDR product, Actionable Intelligence Management. Id. at 9.

The remaining question for the purpose of summary judgment is whether Kodak's marketing and sale of Synergetics violates the Master Agreement. Kodak contends that since the Court reviewed the evidence of competition concerning Synergetics at the preliminary injunction stage, ITyX AG has not adduced any other material evidence that the sale of Synergetics competes with the Kodak Product. As the Court explained in its order on the motion for a preliminary injunction, (1) there has been only one sale of Synergetics software worldwide over the one and a half years preceding that order, (2) that sale involved a customer using Synergetics to process structured content, as opposed to unstructured content, and (3) there is no evidence that any existing or potential customer purchased Synergetics from Kodak as a replacement for or an alternative to the Kodak Product. [ECF No. 100 at 13].

Following the completion of discovery, ITyX AG adds only the deposition testimony of its employee, Andreas Rittler, and one Kodak marketing brochure, both of which suggest, at most, that Synergetics shares some functionality with the Kodak Product. [ECF No. 204 at 8−9]. There is little evidence, however, that any customer would purchase Synergetics instead of the Kodak Product, that any customer has in fact purchased Synergetics for performing unstructured content extraction, or that Synergetics poses a credible competitive threat to ITyX AG's business, customer base, or potential revenue in relation to the Kodak Product. Regardless of the particular definition that the Court ultimately adopts for "new Kodak-IDR product" or "IDR business represented by the Kodak Product," ITyX AG has not presented any evidence of direct competition between the two products. Summary judgment is therefore granted on Count II with

respect to Synergetics, as well as to Capture Pro and Capture 2.0.[5]

### C. Duration of the Master Agreement

Kodak acknowledges that the question of whether it terminated the Master Agreement on December 18, 2015 is ripe for trial but asserts that the Court should hold now that even if the jury finds that the Master Agreement remained in effect after December 18, 2015, it nonetheless terminated (at the latest) upon the expiration of the agreement's five-year initial term on January 18, 2017. According to Kodak, there is no evidence that the parties intended the Master Agreement to be perpetual and ITyX AG admitted in briefing the motion for a preliminary injunction that the exclusivity provision "remains in force until [January 18, 2017], the expiration of the Initial Term." [ECF No. 188 at 17−18]. Although the Court acknowledges that statements contained in a brief may be adopted as admissions under Rule 56, Cerqueira v. Cerqueira, 828 F.2d 863, 865 (1st Cir. 1987), the circumstances of this case do not warrant holding ITyX AG to statements made at the preliminary injunction stage, particularly where the purported admission in part requires an interpretation of a contested provision of the contract.

Kodak provides no further explanation for its position that, even assuming the December 18 Kodak Notice was insufficient to terminate the Master Agreement as of that date, the initial term provides the outer limits of the contract's duration. The Master Agreement plainly states that the term will "automatically renew" on the anniversary date for successive two-year periods unless properly terminated. The question, then, is not whether the Master Agreement is of perpetual duration, but whether the Master Agreement automatically renewed for a two-year period on the anniversary date or it was properly terminated. Finding proper termination of the

---

[5] Kodak's related request to limit ITyX AG to seeking damages under Count II of the Complaint is denied. Because the surviving portion of Count II was not at issue at the preliminary injunction stage when the Court previously considered injunctive relief, it is unnecessary for the Court to limit the relief sought at this time as it pertains to Actionable Intelligence Management.

Master Agreement depends on Kodak's cause for termination and its compliance (or excusal from compliance) with the notice and cure requirements of the termination provision. If the Master Agreement did not terminate on December 18, 2015, there is no basis for holding at this time that the Master Agreement could not have automatically renewed thereafter. Summary judgment is therefore denied.

### D.    Limitation of Damages

The Master Agreement provides that Kodak pays ITyX AG "royalties" in the form of a "mutually agreed Percentage of the Total Net Revenue," the maximum percentage being "40% of the Net Revenue." ITyX Facts ¶ 21; <u>see</u> Master Agreement at 52 ("Kodak shall pay [ITyX AG] a mutually agreed Percentage . . . of the total Net Revenue . . . generated by the sale of the [Kodak IDR Product], subject to a minimum fee per [end user]."); <u>id.</u> (ITyX AG will receive "a maximum of 40% of the Net Revenue," and that percentage will be negotiated periodically "with the goal of supporting the Kodak IDR business plan"). Appendix D of the Master Agreement also provides for a minimum licensing fee per end user and a minimum maintenance fee payable to ITyX AG. ITyX Facts ¶ 21.

Kodak asks for a determination that ITyX AG waived its right to the minimum fees provided in Appendix D of the Master Agreement, because ITyX AG never enforced its right to those payments during the course of the parties' relationship. ITyX AG responds that Kodak waived its waiver argument by failing to plead it as an affirmative defense, and that even if ITyX AG did not enforce its right to the minimum fees, it has not manifested any intent to waive that right, particularly in light of the Master Agreement's no-waiver provision. <u>See</u> Master Agreement at 38 ("Failure by a Party to enforce any term or condition of this Agreement will not be deemed a waiver of future enforcement of that or any other term or condition.").

"The party claiming waiver as a defense has the burden of proof to establish an intentional and voluntary waiver." Edwards v. Int'l Bus. Machines Corp., No. 89-CV-274, 1994 WL 532499, at *8 (N.D.N.Y. Sept. 26, 1994). Waiver is defined as "an intentional abandonment or relinquishment of a known right or advantage which, but for such waiver, the party would have enjoyed." Id. (quoting Beacon Terminal Corp. v. Chemprene, Inc., 429 N.Y.S. 2d 715, 718 (N.Y. App. Div. 1980)). "Whether there was a knowing and intentional waiver of rights is a factual question that [is determined] based on the totality of the circumstances," and the existence of a non-waiver clause "does not by itself preclude the waiver of a provision of, or right under, the contract." Wyeth v. King Pharms., Inc., 396 F. Supp. 2d 280, 290 (E.D.N.Y. 2005) (citations omitted). "[A] waiver may only be established as a matter of law by the express declaration of a party or in situations where the party's undisputed acts or language are so inconsistent with his purpose to stand upon his rights as to leave no opportunity for reasonable inference to the contrary." Id. (quoting NetTech Solutions, LLC v. ZipPark.com, No. 01 CIV. 2683 (SAS), 2001 WL 1111966, at *6 (S.D.N.Y. Sept. 20, 2001)). Here, there remains a genuine issue of material fact as to whether ITyX AG intended to waive its right to minimum fees by not enforcing the relevant provisions of the Master Agreement. See id. at 291 (court could not infer party's intent in failing to enforce certain contractual rights).

Kodak did not respond in its reply brief to ITyX AG's argument that Kodak failed to plead this affirmative defense. See 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1278 (3d ed. 2015) ("It is a frequently stated proposition of virtually universal acceptance by the federal courts that a failure to plead an affirmative defense as required by Federal Rule 8(c) results in the waiver of that defense and its exclusion from the case."). Given that ITyX AG will be allowed to present its minimum fee assessment to the jury over Kodak's

objections to the sufficiency of the evidence of damages, the Court will allow Kodak to argue that these minimum fees were waived by ITyX AG and to leave the resolution of that issue to the jury. Because this issue arose during discovery and has been briefed by the parties, allowing Kodak to rebut damages in this manner will not unduly prejudice or surprise ITyX AG. <u>See generally</u> <u>Strauss v. BMW Fin. Servs. Vehicle Leasing</u>, 906 N.Y.S.2d 490, 492 (Sup. Ct. 2010) ("The relevant inquiry for the court to hear the never-plead affirmative defense is the prejudice or surprise associated with the assertion of a never plead affirmative defense . . . . Prejudice is and surprise is ameliorated when it is shown that the plaintiff has had a full and fair opportunity to respond and oppose the defense being asserted in connection with summary judgment.").

### E.  Duration of the Follow-on Agreements

Under the Master Agreement, the parties anticipated "that [ITyX AG] will provide additional services as stated in one or more Statements of Work," such as training or "other services in connection with further software development." Master Agreement at 18. On June 25, 2015, ITyX AG and Kodak entered into a Professional Services Transfer Pricing Agreement ("PS Agreement"), which was further amended in writing on August 20, 2015 ("PS Amendment," collectively with the PS Agreement, the "PS Agreements"). [ECF Nos. 1-1, 1-2]; Kodak Facts ¶ 21; ITyX Facts ¶ 35. The PS Agreements further defined the relationship between the parties, establishing that Kodak would focus solely on marketing and sales, and ITyX AG would provide the technology to deliver and support the product. ITyX Facts ¶ 35; <u>see</u> [ECF No. 1-1 at 4] (PS Agreement "will replace all other PS related agreements including previous agreements for technical support, professional services, presales engineering agreements, and executive level sales (ITyX CEO) support agreements").

Kodak seeks to limit the duration of the PS Agreements. The PS Agreement states that it "will be effective by signature from both parties or from June 1st, 2015 on. The agreement has a minimum term of 24 months and is automatically renewable for another year unless a cancellation notice is given." [ECF No. 1-1 at 4]. Further, "[a] cancelation . . . can only be done at year end [December 31] for the following year by written notice, and there is a minimum [12-month] pre-notification period for all decreases in employees." Id. at 7.

Kodak submits that the PS Agreements expired if and when the Master Agreement was terminated, because "the full services under the [PS Agreements] are only necessary if [Kodak] continues to sell [the Kodak Product]." [ECF No. 188 at 22]. The PS Agreement, however, describes a "minimum" term of 24 months, and nothing in the PS Agreements expressly conditions their effectiveness on the duration of the Master Agreement. The plain language therefore does not support Kodak's proposed interpretation that the PS Agreements had a "potential" term of 24 months. [ECF No. 188 at 10]. Thus, summary judgment is denied on Kodak's assertion that the PS Agreements necessarily expired if and when the Master Agreement was terminated.

Alternatively, Kodak maintains that the December 18 Kodak Notice triggered the 12-month pre-notification period beginning on December 31, 2015, resulting in the cancellation of the PS Agreements as of December 31, 2016. ITyX AG, meanwhile, reads the PS Amendment to mean that even after notice of cancellation and the expiration of the 12-month pre-notification period, cancellation does not take effect until all full-time employees are terminated at a rate of two employee terminations per year. This interpretation is based on a section in the PS Amendment stating that "[c]ancellation of the contract . . . means that [staffing] capacity has reached zero per the executed reduction schedule." [ECF No. 1-2 at 11]. ITyX AG incorporates

the two employee terminations per year rate from an entirely separate provision in the PS Agreement which relates to estimating ITyX AG's staffing needs for the upcoming year. [ECF No. 1-1 at 7]. Under ITyX AG's theory, the PS Agreements would not terminate until 2028.

ITyX AG provides no basis for using the separate, unrelated provision regarding estimated staffing needs to potentially extend the process of cancelling the PS Agreements by years. There is no indication that this staffing estimate provision is the "executed reduction schedule" referenced in the PS Amendment. Further, the PS Agreements plainly state that there is a "minimum [12-month] pre-notification period for all decreases in employees," and that the notification period "remains with a [12-month] notification." ITyX AG's interpretation effectively extends the notification period long past 12 months. Thus, the PS Agreements ran for a minimum of 24 months until June 1, 2017, but it is an issue for trial whether the December 18 Kodak Notice triggered the 12-month minimum pre-notification period from the calendar year end, in which case the cancellation would have become effective at the earliest available date (June 1, 2017).

## V.      ITYX AG'S MOTION FOR PARTIAL SUMMARY JUDGMENT

ITyX AG requests summary judgment on its declaratory judgment claim and Kodak's Counterclaims for declaratory judgment, breach of fiduciary duty, and aiding and abetting, primarily based on two arguments: (1) that ITyX AG and Kodak never formed a joint venture giving rise to a fiduciary relationship; and (2) that the Master Agreement was not properly terminated on December 18, 2015 and therefore remains in effect.

### A.      Joint Venture

Kodak's Counterclaims for breach of fiduciary duty, and aiding and abetting the breach of a fiduciary duty, are premised on the conclusion that Kodak and ITyX AG were engaged in a

joint venture or partnership. "Under New York law, participants in a joint venture owe one another the same fiduciary duties that inhere between members of a partnership." N. Shipping Funds I, LLC v. Icon Capital Corp., 921 F. Supp. 2d 94, 102 (S.D.N.Y. 2013) (quoting Argilus v. PNC Fin. Serv. Grp., Inc., 419 Fed. Appx. 115, 119 (2d Cir. 2011)). A joint venture "represents more than a simple contractual relationship." Kidz Cloz, Inc. v. Officially For Kids, Inc., 320 F. Supp. 2d 164, 171 (S.D.N.Y. 2004) (quoting Zeising v. Kelly, 152 F. Supp. 2d 335, 347 (S.D.N.Y. 2001)). It requires more than "mere joint ownership, a community of interest, or a joint interest in profitability," Id. (quoting Zeising, 152 F. Supp. 2d at 347), and it does not arise "simply because two parties have agreed together to act in concert to achieve some stated economic objective." Rocchio v. Biondi, 835 N.Y.S. 2d 401, 403 (N.Y. App. Div. 2007).

"A joint venture pursuant to New York law requires five elements: (1) two or more persons must enter into a specific agreement to carry on an enterprise for profit; (2) their agreement must evidence their intent to be joint venturers; (3) each must make a contribution of property, financing, skill, knowledge, or effort; (4) each must have some degree of joint control over the venture; and (5) there must be a provision for the sharing of both profits and losses." Dinaco, Inc. v. Time Warner, Inc., 346 F.3d 64, 67–68 (2d Cir. 2003) (quoting Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd., 909 F.2d 698, 701 (2d Cir. 1990)). "The absence of any one element 'is fatal to the establishment of a joint venture.'" Kidz Cloz, Inc., 320 F. Supp. 2d at 171 (quoting Zeising, 152 F. Supp. 2d at 347−48). For the purposes of summary judgment, ITyX AG, joined by the Counterclaim Defendants, argues that Kodak has not adduced sufficient evidence of the parties' intent to be joint venturers or of their agreement to share both the profits and losses of the venture. The ITyX Parties do not challenge the sufficiency of the evidence on the remaining elements of a joint venture at this stage.

"In formulating an agreement to be joint venturers, 'the parties must be clear that they intend to form a joint venture, which is a fiduciary relationship, and not a simple contract.'" Kidz Cloz, Inc., 320 F. Supp. 2d at 171 (quoting Precision Testing Labs. v. Kenyon Corp., 644 F. Supp. 1327, 1349 (S.D.N.Y. 1986)). The "ultimate inquiry . . . is whether the parties have so joined their property, interests, skills, and risks [that] their contributions have become one and their commingled properties and interests have been made subject to each of the others' actions, on the trust and inducement that each would act for their joint benefit." Id. (quoting Zeising, 152 F. Supp. 2d at 348. "Significantly, the intent of the parties to form a joint venture may be implied from the totality of their conduct." Schultz v. Sayada, 20 N.Y.S. 3d 438, 439 (N.Y. App. Div. 2015).

Here, there is a genuine dispute of material fact as to whether the parties intended to enter into a joint venture. The Master Agreement refers to the parties' arrangement as a "strategic partnership" but also states that ITyX AG "shall act as an independent contractor and nothing herein shall be construed to make [ITyX AG] or any of its employees, officers, directors or representatives, the agent employee or servant of Kodak." Master Agreement at 5, 36. Although the Court does not treat ITyX AG's references in the Complaint to a "partnership" between ITyX AG and Kodak as dispositive, the Master Agreement and the evidence referenced in Kodak's opposition brief [ECF No. 211-1 at 11−13] provide a sufficient basis for sending the question of the parties' intent to the jury.[6]

ITyX AG also argues that there was no agreement to share profits and losses. "The requirement that the parties have agreed to share in the profits and losses is 'an indispensable essential of a contract of partnership or joint venture.'" Kidz Cloz, Inc., 320 F. Supp. 2d at 171

---

[6] The Court defers a final determination on the admissibility of the evidence of intent to form a joint venture for trial.

(quoting <u>Steinbeck v. Gerosa</u>, 175 N.Y.S. 2d 1, 13 (N.Y. 1958)). "'If there was no agreement as to the manner in which the parties were to share in the profits and the losses, the agreement did not create a joint venture' or a partnership." <u>Id.</u> (quoting <u>Zeising</u>, 152 F. Supp. 2d at 348–49).

Here, there is a triable issue of fact as to whether the parties agreed to share profits. ITyX AG and Kodak agreed that ITyX AG would receive licensing or royalty fees in the maximum amount of 40% of net revenue. Although an agreement to pay licensing fees or royalties alone might not establish that the parties agreed to share profits, such payments combined with the commingling of property, skills, and risks could establish profit sharing. <u>See Steinbeck</u>, 175 N.Y.S. 2d at 13 ("It is true that the word 'royalty' is defined generally as a share of the profits reserved to the owner for permitting another to use his property . . . and that the sharing of profits is an element of a joint venture arrangement."); <u>id.</u> ("An agreement to distribute the proceeds of an enterprise upon a percentage basis does not give rise to a joint venture if the enterprise does not represent a joinder of property, skills and risks."). Kodak has shown, at least for the purposes of summary judgment, that the relationship between ITyX AG and Kodak involved a commingling of property, interests, and skills beyond that of a publisher and author, or trademark licensor and licensee, as in the cases relied on by ITyX AG for its proposition that a royalty agreement never establishes profit sharing. <u>See Dinaco, Inc.</u>, 346 F.3d 64, 67–68 (2d Cir. 2003); <u>Steinbeck</u>, 175 N.Y.S. 2d at 13–14.

Joint venturers must also "agree, either expressly or impliedly, to share liability for the possible obligations, debts, and losses of the joint venture itself." <u>Cosy Goose Hellas v. Cosy Goose USA. Ltd.</u>, 581 F. Supp. 2d 606, 622 (S.D.N.Y. 2008). There can be no joint venture "[i]n the absence of any discussion about loss sharing among the venturers." <u>Id.</u> at 623. Any assertion that "partners do not have to discuss loss sharing only finds support in the minority rule that has

been employed in cases where there is no reasonable expectation among the parties that losses will result from a singular transaction or a limited series of business transactions." Id.; see Street-Works Dev. LLC v. Richman, No. 13 CV 774 VB, 2015 WL 872457, at *5 (S.D.N.Y. Feb. 3, 2015) ("Court can only construe an implied agreement to share losses 'in cases where there is no reasonable expectation among the parties that losses will result from a singular transaction or a limited series of business transactions.'" (quoting Cosy Goose, 581 F. Supp. 2d at 623)).

Although the evidence in the summary judgment record of an agreement to share losses is sparse, given that, among other things, all of the other elements of a joint venture are not in dispute or have triable issues of fact, summary judgment is denied. The parties have not addressed the circumstances described above where an implied agreement to share losses may be found. Accordingly, the facts as described in Kodak's opposition brief, including the indemnity and cost sharing arrangement under the Master Agreement, the shared losses suffered as a result of a cancelled customer contract, the sharing of risks and costs under the PS Agreement, and the parties' acknowledgment that it could take at least three years for the venture to become successful, together create a genuine issue of material fact as to whether the parties agreed to share losses. A failure to establish an agreement to share losses may ultimately prove fatal to several of the Counterclaims, but at this time, the Court will not definitively resolve whether there was a joint venture and Kodak may therefore present its case to the jury. See generally RCR Builders, Inc. v. Batex Contracting Corp., 646 N.Y.S.2d 713, 714 (N.Y. App. Div. 1996) ("Generally, the issue of the existence of a joint venture presents a question of fact for the trier of fact to determine."); In re Cohen, 422 B.R. 350, 378 (E.D.N.Y. 2010) ("A non-moving party's own testimony, if based upon personal knowledge, as to the existence of an agreement to share losses is sufficient to create a triable issue of fact that defeats summary judgment on that

element.").

### B. Termination of the Master Agreement

ITyX AG, joined by the Counterclaim Defendants, moves for summary judgment on Count I of the Complaint and Count VII of the Counterclaims, both of which ask the Court to decide whether Kodak validly terminated the Master Agreement on December 18, 2015. Because summary judgment is denied as to whether ITyX AG and Kodak formed a joint venture, the Court cannot conclude at this stage that the exercise of the call option by ITyX OHG (and ITyX AG's participation therein) was not a valid basis for terminating the Master Agreement. Moreover, even assuming that Kodak did not comply with the notice and opportunity to cure requirements of the termination provision, there is a triable issue of fact concerning whether compliance would have been futile. See generally Point Prods. A.G. v. Sony Music Entm't, Inc., No. 93 CIV. 4001 NRB, 2000 WL 1006236, at *3 (S.D.N.Y. July 20, 2000) ("Providing notice and cure is not required where it would be futile . . . ."); Wolff & Munier, Inc. v. Whiting-Turner Contracting Co., 946 F.2d 1003, 1009 (2d Cir. 1991) (New York law provides that "a party to a contract may be precluded from insisting on strict compliance [with a notice and cure provision] by conduct amounting to a waiver or estoppel" or if strict adherence to the notice and cure provision would have been a "useless act" (citation omitted)). Accordingly, summary judgment is denied as to whether Kodak validly terminated the Master Agreement on December 18, 2015.

### C. Aiding and Abetting Breach of Fiduciary Duty

In Count IV of the Counterclaims, Kodak alleges that ITyX OHG owed a fiduciary duty to KAH under German law and as parties to the IFA, and that ITyX AG knowingly participated in ITyX OHG's breach of its fiduciary duty to KAH by exercising the call option. ITyX AG moves for summary judgment on the grounds that Kodak cannot assert an aiding and abetting

claim for the breach of a fiduciary duty owed to a third party (here, KAH) rather than the counterclaim plaintiff.

"A claim for aiding and abetting a breach of fiduciary duty requires: (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of breach." Flycell, Inc. v. Schlossberg LLC, No. 11-CV-0915-CM, 2011 WL 5130159, at *8 (S.D.N.Y. Oct. 28, 2011) (quoting Lerner v. Fleet Bank, N.A., 459 F.3d 273, 294 (2d Cir. 2006)); see also Wechsler v. Bowman, 285 N.Y. 284, 291 (N.Y. 1941) ("[Anyone] who knowingly participates with a fiduciary in a breach of trust is liable for the full amount of the damage caused thereby to the cestuis que trust."). "With respect to the second requirement, '[a]lthough a plaintiff is not required to allege that the aider and abettor had an intent to harm, there must be an allegation that such defendant had actual knowledge of the breach of duty.'" Lerner, 459 F.3d at 294 (quoting Kaufman v. Cohen, 760 N.Y.S. 2d 157, 169 (N.Y. App. Div. 2003)). Moreover, "[a] person knowingly participates in a breach of fiduciary duty only when he or she provides 'substantial assistance' to the primary violator." Id. (quoting Kaufman, 760 N.Y.S. 2d at 170). Finally, "the alleged injury must "be a direct or reasonably foreseeable result of the conduct." SPV Osus Ltd. v. UBS AG, 882 F.3d 333, 345 (2d Cir. 2018) (quoting Cromer Fin. Ltd. v. Berger, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001)); see Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 446 F. Supp. 2d 163, 201 (S.D.N.Y. 2006) ("[T]he plaintiff must allege that the aiding and abetting defendant proximately caused the harm on which the primary liability is predicated.").

Kodak claims that ITyX AG aided and abetted ITyX OHG's breach of a fiduciary duty owed to KAH, and that Kodak suffered an injury notwithstanding that the underlying breach was

of a fiduciary duty owed to a different party. New York law appears to require that the breach of the fiduciary duty be of a duty owed to plaintiff and not to a third party. See MLSMK Inv. Co. v. JP Morgan Chase & Co., 431 Fed. Appx. 17, 19 (2d Cir. June 6, 2011) ("To state a claim for aiding and abetting breach of fiduciary duty under New York law, a plaintiff must show 'breach by a fiduciary of a duty owed to plaintiff; defendant's knowing participation in the breach; and damages." (quoting SCS Commc'ns, Inc. v. Herrick Co., 360 F.3d 329, 342 (2d Cir. 2004)); Smallberg v. Raich Ende Malter & Co., LLP, 35 N.Y.S. 3d 134, 137 (N.Y. App. Div. 2016) ("To recover damages for aiding and abetting a breach of fiduciary duty, a plaintiff must plead and prove that a fiduciary duty owed to the plaintiff was breached, that the defendant knowingly induced or participated in the breach, and that the plaintiff was damaged as a result of the breach."). Because the case law is not uniform in this respect, however, the Court will assume at this stage that the alleged underlying breach could be an adequate predicate for an aiding and abetting claim. See, e.g., Dineen v. Wilkens, 64 N.Y.S. 3d 56, 58–59 (N.Y. App. Div. 2017) ("A claim for aiding and abetting a breach of fiduciary duty requires: (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that [the] plaintiff suffered damages as a result of the breach." (citation and quotation marks omitted) (emphasis added)); Flycell, Inc., 2011 WL 5130159, at *8 (same).

Although it appears unlikely that Kodak can recover under Count IV (aiding and abetting), the Court denies summary judgment. If it is ultimately determined that there is no fiduciary relationship between ITyX AG and Kodak, and that Kodak had no basis for terminating the Master Agreement, then Kodak will be unable to establish that the alleged injury was proximately caused by ITyX AG's participation in ITyX OHG's breach of a fiduciary duty rather than by Kodak's improper unilateral action. Kodak also may not be able to recover for aiding

and abetting even if ITyX AG and Kodak have a fiduciary relationship, because under such circumstances, Counterclaim Count IV is likely duplicative of Counterclaim Count II (breach of fiduciary duty), in that both Counterclaims are premised on ITyX AG's participation in the exercise of the call option. Because the parties have not briefed whether Kodak may proceed under both Counterclaims Count II and Count IV if ITyX AG and Kodak are in a fiduciary relationship, the Court will not grant summary judgment at this time, recognizing though that ultimately these Counterclaims may be deemed duplicative, and also, that Kodak's alleged harm was proximately caused, at most, by a breach of the fiduciary duty between ITyX AG and Kodak, rather than a fiduciary duty between ITyX OHG and KAH.

## VI.    COUNTERCLAIM DEFENDANTS' MOTIONS

Because the Counterclaim Defendants are not parties to the Master Agreement, and therefore are not subject to its New York choice of law provision, the parties agree that Massachusetts law governs the Counterclaims against the Counterclaim Defendants.

### A.    Counterclaim Count III: Aiding and Abetting Breach of Fiduciary Duty

Counterclaim Defendants move for summary judgment on Counterclaim Count III on the sole ground that ITyX AG does not owe a fiduciary duty to Kodak, and thus there was no underlying breach to have been aided and abetted. As discussed above, whether ITyX AG owes a fiduciary duty to Kodak remains a question for the jury. Accordingly, summary judgment is denied.

### B.    Counterclaim Counts V and VI: Tortious Interference

To state a claim for tortious interference with contractual relations, "[t]he plaintiff must prove that (1) he had a contract with a third party; (2) the defendant knowingly interfered with that contract [by inhibiting the third party's or the plaintiff's performance thereof, depending on

the theory]; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." O'Donnell v. Boggs, 611 F.3d 50, 54 (1st Cir. 2010) (quoting Harrison v. NetCentric Corp., 744 N.E.2d 622, 632 (Mass. 2001)). A claim for tortious interference with business relations requires the plaintiff to prove a similar set of elements: "(1) the plaintiff was involved in a business relationship or anticipated involvement in one, (2) the defendant knew about the relationship, (3) the defendant intentionally interfered with the relationship for an improper purpose or by an improper means and (4) the plaintiff suffered damages as a result." Int'l Floor Crafts, Inc. v. Adams, 477 F. Supp. 2d 336, 339 (D. Mass. 2007) (citing Pembroke Country Club, Inc. v. Regency Sav. Bank, F.S.B., 815 N.E.2d 241, 245 (Mass. App. Ct. 2004)).

Kodak claims that the Counterclaim Defendants committed tortious interference by participating in the exercise of the call option under the IFA, which caused the termination of the Master Agreement and made it impossible for Kodak to fulfill its contractual commitments or enter into new contracts under the Master Agreement. Counterclaim Defendants contend that summary judgment should be granted in their favor on both counts because (1) the Master Agreement was never terminated so Kodak was not actually prevented from fulfilling its contractual commitments or entering new contracts; (2) there is no evidence that the Counterclaim Defendants acted with improper means or motive in exercising the call option; and (3) Kodak cannot prove that it was harmed by the actions of the Counterclaim Defendants.

First, as discussed above, summary judgment is denied on ITyX AG's assertion that the Master Agreement was never terminated. Second, the Counterclaim Defendants argue that the exercise of a contractual right can never give rise to a tortious interference claim, citing Arabian Support & Servs. Co., Ltd. v. Textron Sys. Corp., 855 F.3d 1, 3 (1st Cir. 2017). That case,

however, held that a defendant's compliance with contractual obligations did not support a tortious interference claim. <u>Arabian</u> is inapposite where, as here, the issue is the exercise of a contractual right rather than the performance of a contractual obligation. ITyX OHG was not obligated to exercise the call option, but arguably had a contractual right to do so. <u>See generally Piantes v. Pepperidge Farm, Inc.</u>, 875 F. Supp. 929, 937–38 (D. Mass. 1995) ("Where one party has the right to exercise discretion under the contract, it is bad faith to use that discretion to 'recapture opportunities foregone on contracting as determined by the other party's reasonable expectations.'" (quoting <u>Anthony's Pier Four, Inc. v. HBC Assocs.</u>, 583 N.E.2d 806, 821 (Mass. 1991))). Kodak is entitled, at this point, to present its theory that the exercise of the call option was malicious because the ITyX Parties, arguably knowing that Kodak's default was inadvertent and also knowing that Kodak had paid 99% of the total consideration owed, nonetheless exercised the call option to recapture the ITyX Technology shares and exert leverage in related negotiations, and then refused to rescind it even though Kodak quickly attempted to cure the default. Finally, although the evidence may ultimately show that the conduct of some or all of the Counterclaim Defendants lacked a sufficient causal connection to the alleged harm, there remain issues of material fact as to each Counterclaim Defendants' level of participation in the exercise of the call option,[7] and how its exercise impacted the Master Agreement and the parties' relationships. Accordingly, summary judgment is denied.

### C.    ITyX Technology's Motion for Judgment on the Pleadings

For substantially the same reasons that the Court does not grant summary judgment on the breach of fiduciary duty, aiding and abetting, or tortious interference claims against the ITyX

---

[7] For instance, ITyX AG is the counterparty to the Master Agreement and a different entity, ITyX OHG, exercised the call option under a separate agreement.

Parties, ITyX Technology's motion for judgment on the pleadings is also denied. ITyX Technology argues that the pleadings do not plausibly show that ITyX Technology was involved in the exercise of the call option because it is essentially a holding company without any employees. Kodak adequately pleaded, however, that ITyX Technology, even if it does not have any employees, was controlled by Mr. Arayan, Mr. Groftschik, and/or ITyX OHG (the majority owner of ITyX Technology). Moreover, ITyX OHG exercised the call option in part because Kodak refused to invest an additional €2 million into ITyX Technology. Even considering the summary judgment record, the Court cannot now determine ITyX Technology's role in the exercise of the call option as compared to ITyX OHG, Mr. Arayan, or any of the other ITyX Parties. Accordingly, the motion is denied.

## VII.    CONCLUSION

For the foregoing reasons, the motion for judgment on the pleadings [ECF No. 158] is DENIED; ITyX AG's motion for partial summary judgment [ECF No. 182] is DENIED; Counterclaim Defendants' motion for summary judgment [ECF No. 185] is DENIED; and Kodak's motion for summary judgment [ECF No. 187] is GRANTED in part DENIED in part.

**SO ORDERED.**

May 25, 2018                                          /s/ Allison D. Burroughs
                                                     ALLISON D. BURROUGHS
                                                     U.S. DISTRICT JUDGE